

**SEALED**

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | 1:24CR141-1 |
| | : | |
| WILLIAM AMBROSE SIMPSON, II | : | |

The Grand Jury charges:

Background

At all times relevant hereto:

**Introductory Allegations**

A. The United States Small Business Administration ("SBA") was an executive-branch agency of the United States government that provided support to entrepreneurs and small businesses. The mission of the SBA was to maintain and strengthen the nation's economy by enabling the establishment and viability of small businesses and by assisting in the economic recovery of communities after disasters.

B. As part of that effort, the SBA enabled and provided loans through banks, credit unions, and other lenders that had government-backed guarantees. The SBA also provided direct loans.

C. The SBA 7(a) loan program was the SBA's primary business loan program for providing financial assistance to small businesses.

D. The Economic Injury Disaster Loan ("EIDL") program was an SBA program that provided low-interest financing to small businesses in regions affected by declared disasters.

E. The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was a federal law enacted in or around March 2020 to provide emergency financial assistance to Americans suffering negative economic effects caused by the COVID-19 pandemic.

F. One source of relief provided by the CARES Act was the authorization of up to $349 billion in forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the Paycheck Protection Program (PPP). In or around April 2020, Congress authorized over $300 billion in additional PPP funding.

G. To obtain a PPP loan, businesses were required to submit a PPP loan application, signed by an authorized representative of the business, acknowledging the program rules. The business was required to state (a) its average monthly payroll expenses and (b) the number of employees. These figures were used to calculate the amount of money the small business was eligible to receive under the PPP. In addition, businesses applying for a PPP loan were required to provide documentation showing their payroll expenses.

H. A PPP loan application was required to be processed by a participating financial institution ("Lender"). If a PPP loan application was

2

approved, the Lender funded the PPP loan using its own moneys, which were 100% guaranteed by the SBA. Data from the application, including information about the borrower, the total amount of the loan, and the listed number of employees, were transmitted by the Lender to the SBA in the course of processing the loan.

I. PPP loan proceeds were required to be used by businesses on certain permissible expenses such as: payroll costs, interest on mortgages, rent, and utilities. Loans provided through the PPP had government-backed guarantees and were 100% forgivable if the borrower submitted documentation to the PPP Lender and SBA demonstrating that a certain portion of the PPP loan proceeds were utilized to meet existing payroll obligations and to retain employees.

J. The CARES Act authorized the SBA to provide loans ("EIDL loans") of up to $2 million to eligible small businesses experiencing substantial financial disruptions due to the COVID-19 pandemic. In addition, the CARES Act authorized the SBA to issue advances of up to $10,000 to small businesses within three days of applying for an EIDL ("EIDL advances"). The amount of the EIDL advance was determined by the number of employees the applicant certified having. The advances did not have to be repaid.

K. In order to obtain an EIDL loan and advance, a qualifying business was required to submit an application to the SBA and provide information

about its operations, such as the number of employees, gross revenues for the 12-month period preceding the disaster, and cost of goods sold in the 12-month period preceding the disaster. In the case of EIDL loans for COVID-19 relief, the 12-month period was that 12-month period preceding January 31, 2020. The business must have been operating as of February 1, 2020 to qualify for a loan. The applicant was also required to certify that all of the information in the application was true and correct to the best of the applicant's knowledge, and agree in the Loan Authorization and Agreement that EIDL funds would be used solely to alleviate economic injury caused by the disaster.

L. EIDL applications were submitted directly to the SBA and processed by the agency with support from a government contractor. The amount of the loan, if the application was approved, was determined based, in part, on the information provided by the application about employment, revenue, and cost of goods, as described above. EIDL loan and advance funds were issued directly by the SBA.

M. Pursuant to the provisions governing the EIDL program, loan proceeds could only be used on certain permissible expenses. More specifically, the business could use EIDL loans and advances to pay fixed debts of the business, payroll of the business, accounts payable of the business, and other bills of the business that could have been paid had the COVID-19 disaster not occurred.

4

**Relevant Entities**

N. WILLIAM AMBROSE SIMPSON, II, was a resident of Cabarrus County, North Carolina, within the Middle District of North Carolina.

O. Grow Fit Kids, Inc. ("Grow Fit Kids") was a business name incorporated with the North Carolina Secretary of State. WILLIAM AMBROSE SIMPSON, II, was the registered agent for the business, as well as the listed president.

P. Ambrose Cubed, LLC ("Ambrose Cubed") was a business name incorporated with the North Carolina Secretary of State. WILLIAM AMBROSE SIMPSON, II, was the registered agent, as well as the listed owner manager.

Q. Green to Go Transporters, LLC ("Green to Go Transporters") was a business name incorporated with the North Carolina Secretary of State. WILLIAM AMBROSE SIMPSON, II, was the registered agent for the business, as well as the listed member.

R. Financial Institution 1 was a company that offered commercial loans, including small business loans through the PPP.

S. Financial Institution 2 was a bank insured by the Federal Deposit Insurance Corporation that also offered commercial loans, including small business loans through the PPP.

T.  Financial Institution 3 was a company that offered commercial loans, including small business loans through the SBA 7(a) program.

**The Scheme and Artifice**

1. From in or about March 2020, continuing up to and including in or about November 2021, the exact dates to the Grand Jurors unknown, in the County of Cabarrus in the Middle District of North Carolina, and elsewhere, WILLIAM AMBROSE SIMPSON, II, devised and intended to devise a scheme to defraud the SBA, Financial Institution 1, Financial Institution 2, and Financial Institution 3 as to material matters, and to obtain money, funds, assets, and other property owned by and in the custody and control of the SBA, Financial Institution 1, Financial Institution 2, and Financial Institution 3 by means of material false and fraudulent pretenses, representations, and promises, and the concealment of material facts.

2. It was the object of the scheme to defraud for WILLIAM AMBROSE SIMPSON, II, to personally enrich himself by fraudulently obtaining, and attempting to obtain, EIDL, PPP, and SBA 7(a) loan funds for his own personal use and benefit.

*Manner and Means*

It was part of the scheme to defraud that:

3. WILLIAM AMBROSE SIMPSON, II, submitted various applications for PPP and EIDL loans for at least three businesses: Ambrose

6

Cubed, Green to Go Transporters, and Grow Fit Kids in which SIMPSON made false and fraudulent representations for purposes of obtaining the loans.

4. WILLIAM AMBROSE SIMPSON, II, submitted an application to Financial Institution 3 for an SBA 7(a) loan for Ambrose Cubed in which SIMPSON made false and fraudulent representations for the purpose of securing the loan, including the submission of altered bank statements.

EIDL and PPP Loans for Ambrose Cubed

5. On or about April 1, 2020, WILLIAM AMBROSE SIMPSON, II, submitted, and caused to be submitted, an application for an EIDL loan for Ambrose Cubed. On that application, SIMPSON made material misrepresentations. For example, SIMPSON falsely represented that Ambrose Cubed had gross revenues of $933,000 for the twelve months prior to the date of the disaster and seven employees, when in truth and in fact, SIMPSON knew those statements were materially false.

6. As a result of misrepresentations, the SBA approved the EIDL application and deposited and EIDL advance of $7,000 and an EIDL loan of $244,400 into Ambrose Cubed's bank account ending in 3912 which SIMPSON controlled.

7. In or around July 2021 and November 2021, WILLIAM AMBROSE SIMPSON, II, submitted, and caused to be submitted, requests for an increase in the Ambrose Cubed EIDL loan. As a result of misrepresentations, the SBA

7

approved the increase requests and deposited $668,400 in additional EIDL funds into account ending in 3912.

8. On or about April 23, 2020, WILLIAM AMBROSE SIMPSON, II, submitted, and caused to be submitted, an application for a PPP loan to Financial Institution 1 for Ambrose Cubed. On that application, SIMPSON falsely claimed that Ambrose Cubed had an average monthly payroll of approximately $38,333 and seven employees, when in truth and in fact, SIMPSON knew Ambrose Cubed did not have any formalized payroll obligations.

9. In support of the application, WILLIAM AMBROSE SIMPSON, II, submitted, and caused to be submitted, fraudulent documentation purporting to show Ambrose Cubed's 2019 payroll expenses. Specifically, SIMPSON submitted an Internal Revenue Service Form 944, Employer Annual Federal Tax Return for 2019 in which SIMPSON falsely claimed that he paid wages, tips, and other compensation of $459,990.

10. As a result of misrepresentations, Financial Institution 1 approved the loan application and deposited $95,800 in PPP loan funds into account ending in 3912.

11. On or about February 20, 2021, WILLIAM AMBROSE SIMPSON, II, submitted, and caused to be submitted, an application for a second draw PPP loan to Financial Institution 1 for Ambrose Cubed. On that application,

8

Case 1:24-cr-00141-UA   Document 1   Filed 04/29/24   Page 8 of 16

SIMPSON falsely claimed that Ambrose Cubed had an average monthly payroll of approximately $41,225 and seven employees, when in truth and in fact, SIMPSON knew Ambrose Cubed did not have any formalized payroll obligations.

12. As a result of misrepresentations, Financial Institution 1 approved the loan application and deposited $103,062 in second draw PPP loan funds into account ending in 3912.

13. In total, WILLIAM AMBROSE SIMPSON, II, received approximately $1,118,662 in PPP and EIDL funds for Ambrose Cubed based on his material misstatements. After receiving the funds, SIMPSON made unauthorized expenses, including gambling and other personal expenses.

EIDL Loan For Green to Go Transporters

14. On or about April 1, 2020, WILLIAM AMBROSE SIMPSON, II, submitted, and caused to be submitted, an EIDL application to the SBA for a company called Green to Go Transporters. On that application, WILLIAM AMBROSE SIMPSON, II, fraudulently represented, among other things, that the business had gross revenues of $220,000 and three employees for the twelve months prior to the date of the disaster, when in truth and in fact, as SIMPSON then well knew, Green to Go Transporters had no apparent business operations or employees.

15. As a result of misrepresentations, the SBA approved the EIDL application and deposited $97,400 in EIDL funds into a bank account in WILLIAM AMBROSE SIMPSON, II,'s name ending in 1612.

16. After receiving the EIDL funds, WILLIAM AMBROSE SIMPSON, II, transferred the funds into Ambrose Cubed's bank account ending in 3912 and made unauthorized expenses.

Loans for Grow Fit Kids

17. On or about March 19, 2020, WILLIAM AMBROSE SIMPSON, II, submitted, and caused to be submitted, an EIDL application to the SBA for a company called Grow Fit Kids. On that application, WILLIAM AMBROSE SIMPSON, II, made material misrepresentations. For example. SIMPSON falsely represented that the business had gross revenues of $390,000 and seven employees for the twelve months prior to the date of the disaster, when in truth and in fact, SIMPSON knew those statements were materially false.

18. As a result of misrepresentations, the SBA approved the EIDL application and deposited $95,000 in EIDL funds into Grow Fit Kids's bank account ending in 8395 which SIMPSON controlled.

19. On or about May 27, 2020, WILLIAM AMBROSE SIMPSON, II, submitted, and caused to be submitted, an application for a PPP loan to Financial Institution 2 on behalf of Grow Fit Kids Inc. On that application, SIMPSON falsely claimed that Grow Fit Kids had an average monthly payroll

10

Case 1:24-cr-00141-UA   Document 1   Filed 04/29/24   Page 10 of 16

of approximately $42,000, when in truth and in fact, SIMSPON then well knew, Grow Fit Kids did not have any payroll obligations.

20. WILLIAM AMBROSE SIMPSON, II, also submitted, and caused to be submitted, fraudulent documentation purporting to show Grow Fit Kids' 2019 payroll expenses to support the amounts of the PPP loan for which he was applying. Specifically, SIMPSON submitted an Internal Revenue Service Form 944, Employer Annual Federal Tax Return for 2019 in which SIMPSON falsely claimed that he paid wages, tips, and other compensation of $504,000.

21. As a result of misrepresentations, Financial Institution 2 approved the PPP application and deposited $105,000 in loan funds into bank account ending in 8395.

22. After receiving the PPP and EIDL funds, WILLIAM AMBROSE SIMPSON, II, made unauthorized expenses, including making payments on a residential home.

SBA 7(a) Loan for Ambrose Cubed

23. In or around January 2021, WILLIAM AMBROSE SIMPSON, II, submitted, and caused to be submitted, an application to Financial Institution 3 for a SBA 7(a) loan for Ambrose Cubed.

24. As part of the application, WILLIAM AMBROSE SIMPSON, II, made, and caused to be made, false and fraudulent statements and representations, which SIMPSON knew were false and fraudulent. For

11

example, SIMPSON submitted falsified financial statements and at least four months of altered bank statements for the purposes of making it appear as though Ambrose Cubed had business income which would support the issuance of the loan.

25. As a result of misrepresentations, Financial Institution 3 approved a $2,000,000 loan for Ambrose Cubed. Financial Institution 3 caused approximately $852,272 of the loan proceeds to be deposited into Ambrose Cubed's bank account ending in 3912 which SIMPSON controlled.

26. After receiving the funds, WILLIAM AMBROSE SIMPSON, II, made unauthorized expenses, including gambling and other personal expenses.

## COUNTS ONE THROUGH SIX
(Wire Fraud)

1. Paragraphs 1 through 26 are incorporated by reference as if fully set forth herein.

2. On or about the dates specified as to each count below, in the County of Cabarrus, in the Middle District of North Carolina, and elsewhere, WILLIAM AMBROSE SIMPSON, II, having knowingly devised and intended to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, did transmit and cause to be transmitted by means of wire

communications in interstate commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, as set forth below:

| Count | Approximate Date | Description |
|---|---|---|
| 1 | April 1, 2020 | An application for EIDL funds for Green to Go Transporters that was submitted from North Carolina and routed in interstate commerce. |
| 2 | April 1, 2020 | An application for EIDL funds for Ambrose Cubed that was submitted from North Carolina and routed in interstate commerce. |
| 3 | April 15, 2020 | A wire transfer of EIDL funds that was routed in interstate commerce from the SBA to Simpson's account ending in x8395. |
| 4 | April 23, 2020 | A signed application for PPP funds for Ambrose Cubed that was submitted from North Carolina and routed in interstate commerce. |
| 5 | January 11, 2021 | A signed application document for a SBA 7(a) loan for Ambrose Cubed that was submitted from North Carolina and routed in interstate commerce. |
| 6 | February 20, 2021 | A signed application for PPP funds for Ambrose Cubed that was submitted from North Carolina and routed in interstate commerce. |

All in violation of Title 18, United States Code, Section 1343.

## COUNTS Seven through Eleven
(Money Laundering)

1.     Paragraphs 1 through 26 are incorporated by reference as if fully set forth herein.

2.     On or about the dates listed below, in the County of Cabarrus, in the Middle District of North Carolina and elsewhere, the defendant, WILLIAM AMBROSE SIMPSON, II, did knowingly engage and attempt to engage in a monetary transaction in criminally derived property of a value greater than $10,000, and which in fact, was derived from specified unlawful activity, as set forth below, which funds in fact were derived from wire fraud, in violation of Title 18, United States Code, Section 1343:

| Count | Approximate Date | Description of Transaction |
| --- | --- | --- |
| 7 | May 5, 2020 | Wire transfer of $360,000 to a law firm for purchase of real property. |
| 8 | September 3, 2020 | Wire transfer of $75,000 to a law firm for purchase of real property. |
| 9 | March 4, 2021 | Wire transfer of $25,000 to casino in Las Vegas. |
| 10 | March 31, 2021 | Cashier's check in the amount of $175,000 addressed to a casino in Pennsylvania. |
| 11 | October 12, 2021 | Wire transfer of $100,000 to casino in Las Vegas. |

All in violation of Title 18, United States Code, Section 1957.

14

## FORFEITURE ALLEGATION

1. The allegations contained in this Indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Sections 981(a)(1)(A), 981(a)(1)(C), and 982(a)(1), and Title 28, United States Code, Section 2461(c).

2. Upon conviction of one or more of the offenses charged in this Indictment, the defendant, WILLIAM AMBROSE SIMPSON, II, shall forfeit to the United States any property, real or personal, involved in such offense, or which constitutes or is derived from proceeds traceable to such offense, or a conspiracy to commit such offense.

3. The property to be forfeited may include, but is not limited to, a money judgment, in an amount to be determined, representing the value of the property subject to forfeiture as a result of such offense.

4. If any of the property described above as being subject to forfeiture as a result of any act or omission of the defendant cannot be located upon the exercise of due diligence, has been transferred or sold to or deposited with a third person, has been placed beyond the jurisdiction of the Court, has been substantially diminished in value, or has been commingled with other property which cannot be divided without difficulty, it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1), and Title 28, United States

Code, Section 2461(c), to seek forfeiture of any other property of said defendant up to the value of the above forfeitable property.

All pursuant to Title 18, United States Code, Sections 981(a)(1)(A), 981(a)(1)(C), and 982(a)(1), Rule 32.2, Federal Rules of Criminal Procedure, and Title 28, United States Code, Section 2461(c).

DATED: April 29, 2024

SANDRA J. HAIRSTON
United States Attorney

*Ashley E. Waid*
BY: ASHLEY E. WAID
Assistant United States Attorney

A TRUE BILL:

_____
FOREPERSON

16